# EXHIBIT A

# TRANSPORTATION AGREEMENT

This Transportation Agreement (this "Agreement") is effective as of August 13, 2007 ("Effective Date") by General Freight Services, Inc., a Georgia corporation ("Company"), and Amazon Fulfillment Services, Inc., a Delaware corporation and any of its affiliates for which Company provides services ("Amazon").

## 1.    CARRIER SERVICES

1.1    Services.  At Amazon's request, Company will provide the services ("Carrier Service" or "Carrier Services") to Amazon as described in attached Exhibits A and B.  Unless otherwise agreed, Company will arrange for all equipment and supplies required to perform the Carrier Services.  Amazon makes no promises or representations whatsoever as to the amount of business Company can expect at any time under this Agreement.  Amazon may from time to time give volume projections to Company, but such projections are speculative only and will not in any event give rise to Customer liability.  The parties acknowledge and agree that Amazon may engage the services of other carriers that may perform the same or similar Carrier Services as those provided by Company.  Company will comply with the tracking requirements and performance standards (the "Performance Standards") set forth in attached Exhibits A and B.

1.2    Reports, Audits and Record Retention.  Company will provide business activity reports in a mutually agreed format, including (a) weekly performance and exception reports, (b) electronic summary reports itemizing weekly volume, and (c) such other reports described in attached Exhibit B.  Amazon will have the right upon reasonable notice to Company to conduct a performance audit to determine if Company is meeting its obligations hereunder.  Company agrees to provide all relevant reports and related information in a mutually agreed format, to allow Amazon to conduct such audit.  If an audit identifies an overcharge by Company in excess of five percent (5%) for the period audited, Company will pay for the cost of the audit.  Company will also reimburse Amazon for the full amount of any overcharge identified in the audit within ten (10) days from receipt of the audit results.  During the term of this Agreement and for three (3) years thereafter, Company will keep all books and records relating to the Carrier Services in accordance with generally accepted accounting standards.  Amazon may examine such books and records upon reasonable notice and during normal business hours.

## 2.    PAYMENT

2.1    Fees and Expenses.  Amazon will pay Company in accordance with the rate structure and accessorial charges (if any) attached as Exhibit A ("Fees and Expenses").  The Fees and Expenses will not be modified during the term of this Agreement, except upon mutual agreement of the parties.  Company is entitled to no other compensation or reimbursement for the Carrier Services other than as provided in Exhibit A.

2.2    Invoices.  Company will provide weekly electronic invoices that include fees for the prior week. Company will provide each invoice in a mutually agreeable format, provided that at Amazon's election, Company will issue separate invoices for each Amazon affiliate for which it provides Service (the parties agreeing that each such affiliate is solely responsible for payment for Carrier Services provided to it under this Agreement); and (ii) each invoice will include sufficient information for Amazon to determine the accuracy of the amounts, including but not limited to, copies of the relevant bill of lading and proof of delivery (if applicable).  Amazon will pay Company's properly submitted, and undisputed portions of,

invoices within thirty (30) days of receipt.  Amazon has no obligation to pay any Fees or Expenses invoiced more than six (6) months after they accrue.

3.   **TERM.**  The term of this Agreement shall be for the period of 2 years ("Initial Term"); *provided, however,* Amazon may terminate this Agreement at any time without cause on 30 days advance notice to Company.  Upon expiration of the Initial Term, the Agreement will renew on a month-to-month basis, and either party may terminate the Agreement without cause by providing 30 days prior written notice to the other party; *provided, however,* Company may not terminate this Agreement without cause with an effective date during any September 1 through December 15 period (so that, in order for any such termination to become effective before December 16 of any year, Company must exercise its termination right before August 1 of that year).  In addition, either party may terminate this Agreement if the other fails to cure a material breach hereunder within 30 days of receipt of written notice of such breach.  If this Agreement is terminated by either party, Company will diligently work to complete any deliveries still in progress. Neither party shall be entitled to any severance payment, penalty, damages or compensation in any form or manner based upon, or due to, the other party's decision to terminate or refrain from renewing this Agreement.  If either party is adjudicated bankrupt, institutes voluntary proceedings for bankruptcy or reorganization, makes an assignment for the benefit of its creditors, applies for or consents to the appointment of a receiver for it or its property, or admits in writing its inability to pay its debts as they become due, the other party may terminate this Agreement by written notice. Any such termination will not relieve either party from any accrued obligations hereunder.

4.   **REPRESENTATIONS AND WARRANTIES**

Company represents and warrants that: (i) it will perform the Carrier Services in a competent and workmanlike manner in accordance with the level of professional care customarily observed by highly skilled professionals rendering similar Carrier Services; (ii) the Carrier Services, Work Product and/or other materials provided by or on behalf of Company will not violate or infringe any third party's patents, trade secrets, trademarks or other proprietary rights; (iii) it will meet, at a minimum, the Performance Standards indicated in Exhibit A; (iv) it and its employees, agents, subcontractors (including, but not limited to carriers hired by Company ("Carrier") to transport the goods) (together, "Personnel") will comply with all applicable laws, rules, regulations and orders pertaining to the Carrier Services, and hold and comply with all required licenses, permits and approvals; (v) it will promptly notify Amazon of any accident, incident, or event that impairs the safety of or delays delivery of shipments, and will use reasonable care and due diligence in the protection of the goods or shipments; and (vi) it will at all times have sufficient equipment, personnel and resources available to handle all Amazon capacity requirements.

5.   **CONFIDENTIALITY; CUSTOMER INFORMATION; WORK PRODUCT.**

5.1   Confidentiality/Publicity.  As a condition to Amazon's obligations hereunder, Company and its employees, representatives and subcontractors will comply with the terms of the Nondisclosure Agreement signed by Company ("NDA").  Company will not use any trade name, trademark, service mark, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including but not limited to use in any client list, press release, advertisement or other promotional material) without prior written authorization of such use by a Vice President of Amazon.

5.2   Customer Information.  Company will use all personally identifiable information concerning Amazon customers, including names and addresses (collectively "Customer Information"), that it receives solely for purposes of providing Carrier Services under this Agreement. Company will not transfer, rent, barter, trade or sell such information and will not develop lists of or aggregate such information. Company will delete all instances (including backups and other copies) of Customer Information associated with each shipment within 120 days after completing the shipment.  Before disposing of any

hardware, media or software (including any sale or transfer of such material or any disposition of Company's business) that contains or previously contained Customer Information, Company will perform a complete forensic destruction of the Customer Information (which may include a physical destruction, preferably incineration, or secure data wipe) such that no such information can be recovered or retrieved.

5.3     Work Product.

5.3.1 Work Product, Proprietary Rights and Pre-Existing Work.  If Company delivers or is required to deliver to Amazon any work product in connection with the Carrier Services, including but not limited to concepts, works, inventions, information, drawings, designs, programs, or software (whether developed by Company or any of its Personnel, either alone or with others, and whether completed or in-progress) (collectively, "Work Product"), then Amazon owns, or upon assignment by the creator will own, all right, title and interest (including, but not limited to, all trademarks, trade secrets, copyrights, patents and any other intellectual property or proprietary rights) (collectively, "Proprietary Rights") in such Work Product, except that Work Product does not include: (a) any inventions or developments made by Company prior to the Effective Date; or (b) any improvements Company may make to its own proprietary software or any of its internal processes as a result of any Work Order, provided that such improvements do not infringe Amazon's Proprietary Rights ("Pre-Existing Work").

5.3.2 Work for Hire.  The Work Product has been specially ordered and commissioned by Amazon. Company agrees that the Work Product is a "work made for hire" for copyright purposes, with all copyrights in the Work Product owned by Amazon.

5.3.3 Assignment of Work Product.  To the extent that the Work Product does not qualify as a work made for hire under applicable law, and to the extent that the Work Product includes material subject to copyright, patent, trade secret, or any Proprietary Rights protection, Company hereby assigns to Amazon (or to such of its affiliates as it may designate), its successors and assigns, all right, title and interest in and to the Work Product, including, but not limited to, all rights in and to any inventions, designs and Proprietary Rights embodied in the Work Product or developed in the course of Company's creation of the Work Product.  The foregoing assignment includes a license under any current and future patents owned or licensable by Company to the extent necessary to combine the Work Product or any derivative works or modifications thereof with any product, service, offering, software or intellectual property of Amazon.  Company will execute any documents in connection with such assignment that Amazon may reasonably request.  Company will enter into agreements with its Personnel or any other party as necessary to establish Amazon's sole ownership in Work Product, and upon Amazon's request, Company will provide Amazon with copies of such agreements.  Company appoints Amazon as its attorney-in-fact to execute assignments of, and register all rights to, the Work Product and the Proprietary Rights in Work Product.  This appointment is coupled with an interest. At any time upon request from Amazon and upon termination or expiration of this Agreement, Company will deliver to Amazon in tangible form all materials containing Work Product, whether complete or in process.

5.3.4 License to Pre-Existing Work.  To the extent Pre-Existing Work of Company is embodied in any Work Product, deliverables or Proprietary Rights, Company hereby grants Amazon a non-exclusive, worldwide, perpetual, irrevocable, fully paid up license to (a) use, make, have made, sell, offer to sell, reproduce, perform, display, distribute, and import such Pre-Existing Work, (b) adapt, modify, and create derivative works of such Pre-Existing Work, and (c) sublicense the foregoing rights.

6.     DEFENSE/INDEMNITY.  Company hereby releases and will defend, hold harmless, and indemnify Amazon, and/or its subsidiaries, affiliates, directors, officers, employees, agents, successors and assigns ("Amazon Indemnified Parties"), from and against any allegation or claim based on, or any loss, damage, settlement, cost, expense and any other liability (including but not limited to reasonable

attorneys' fees incurred and/or those necessary to successfully establish the right to indemnification) (collectively, "Claims"), arising from any act or omission by Company and/or its Personnel, including without limitation any breach of this Agreement or allegation or claim of negligence, strict liability or misconduct. However, the foregoing does not apply to the extent such Claim results from Amazon's negligent or willful misconduct. Company's duty to defend is independent of its duty to indemnify. Company's obligations under this section are independent of all of its other obligations under this Agreement. Company will use counsel reasonably satisfactory to Amazon to defend each Claim, and Amazon will cooperate (at Company's expense) with Company in the defense. Company will not consent to the entry of any judgment or enter into any settlement without Amazon's prior written consent, which may not be unreasonably withheld. The parties agree that this Section 6 does not apply to claims for loss or damage under Section 7.

7.    **DAMAGE OR LOSS TO GOODS.** Company will in no event be liable for any loss, theft or damage to goods for any amount in excess of two hundred fifty thousand dollars ($250,000) per container except to the extent such loss or damage is attributable to the negligence or misconduct of Company or any of its employees, representatives, agents, affiliates or subcontractors (including Carriers). Amazon has the option of paying a special compensation to increase the liability of Company in excess of the amount per shipment specified in above in case of any loss, theft or damage from causes which would make Company liable, but such option can be exercised only by specific written agreement made with Company prior to shipment, which agreement will indicate the limit of Company's liability and the special compensation for the added liability by it to be assumed.

8.    **INSURANCE.** Company shall, throughout the term of this Agreement, carry, at its expense and have in force and effect:

> (i) commercial general liability insurance with a limit of not less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) in the aggregate;

> (ii) worker's compensation insurance and employer's liability insurance as required by statute;

> (iii) cargo insurance of two hundred fifty thousand dollars ($250,000) per loss; and

> (iv) business automobile liability insurance (including coverage for all owned, non-owned and hired auto, and no fault coverage where applicable) with limits of not less than $1,000,000 per occurrence for bodily injury and property damage combined.

Company will cause each insurance policy to provide that it will not be canceled or allowed to expire without at least thirty (30) days prior written notice from the insurance provider to Amazon. Company will cause Amazon to be named as additional insureds on general liability policies and will submit certificates of insurance for the coverage required under this Section at commencement of the Carrier Services and at Amazon's request. Company will send certificates of insurance to Amazon.com, Attn: Risk Management, P.O. Box 81226, Seattle, WA 98108-1226. Amazon's approval of any of Company's insurance policies does not relieve or limit any of Company's obligations under this Agreement, including but not limited to liability under Section 8 above for claims exceeding required insurance limits.

9.    **PERSONNEL; INDEPENDENT CONTRACTORS**

9.1    Company's Personnel. All Personnel furnished by Company to provide Carrier Services are employees, agents or subcontractors of Company and are not employees, agents or subcontractors of Amazon. Company and Amazon are independent contractors. Company has exclusive control over its Personnel, its labor and employee relations and its policies relating to wages, hours, working conditions

and other employment conditions. Company will ensure that all Personnel comply with Amazon's rules and policies while on Amazon's premises. Company has the exclusive right to hire, transfer, suspend, lay off, recall, promote, discipline, discharge and adjust grievances with its Personnel. Company is solely responsible for all salaries and other compensation of Personnel who arrange for Carrier Services. Company is solely responsible for making all deductions and withholdings from the salaries and other compensation of its Personnel and for paying all contributions, taxes and assessments. Company's Personnel are not eligible to participate in any employment benefit plans or other benefits available to Amazon employees. Company has no authority to bind Amazon to any agreement or obligation.

9.2   Subcontractors. Notwithstanding the existence or terms of any subcontract, Company will remain responsible for the full performance of the Carrier Services. The terms and conditions of this Agreement are binding upon Company's agents, subcontractors (including Carriers) and affiliates ("Subcontractors"). Company (a) will ensure that all Subcontractors comply with this Agreement and (b) will be responsible for all acts, omissions, negligence and misconduct of such Subcontractors. Company will also ensure that all Subcontractors effectively and irrevocably: waive any lien upon (or other right with respect to) the products transported, regardless of whether such Subcontractor would otherwise be entitled to such lien or other rights pursuant to contract or applicable law; and waive any claim (including, without limitation, for amounts owed for delivery services) against Amazon and its affiliates. Without in any way limiting Company's obligations or Amazon's rights under Section 6 above, if any Subcontractor asserts any claim, demand, suit, or action ("Subcontractor Claim") against Amazon and/or its affiliates, and Company is undergoing any bankruptcy proceeding: Amazon may at its sole discretion, but is not obligated to, defend and/or settle such Subcontractor Claim at Company's cost and expense; and for the avoidance of doubt, if Amazon incurs or pays any damages, liabilities, losses, reasonable costs and expenses, or any other reasonable amounts relating to such Subcontractor Claim, Amazon may set off such amounts in full against any amounts Amazon owes to Company and/or demand immediate full reimbursement from Company.

## 10.   GENERAL

10.1   Assignment. Company will not assign any part or all of this Agreement, or subcontract or delegate any of Company's obligations or rights under this Agreement, without Amazon's prior written consent. Any attempt to assign, subcontract or delegate in violation of this Section is void in each instance.

10.2   Governing Law/Venue. The internal laws of the State of Washington, excluding its conflicts of law rules, govern this Agreement. Company irrevocably submits to venue and exclusive personal jurisdiction in the federal and state courts in King County, Washington for any dispute arising out of this Agreement, and waives all objections to jurisdiction and venue of such courts.

10.3   Notices. Notices under this Agreement are sufficient if given by nationally recognized overnight courier service, certified mail (return receipt requested), facsimile with electronic confirmation or personal delivery to the other party at the addresses set forth in the signature blocks below. Notice is effective: (i) when delivered personally, (ii) three business days after sent by certified mail, (iii) on the business day after sent by a nationally recognized courier service, or (iv) on the business day after sent by facsimile with electronic confirmation to the sender. A party may change its notice address by giving notice in accordance with this Section. If this Section states no notice address for Company, notice will be effective if given to Company at its last known address.

10.4   Severability/Waiver/Remedies. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the extent that they are

enforceable. A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder. Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver. The rights and remedies of the parties under this Agreement are cumulative, and either party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity. Company acknowledges that any material breach of this Agreement by Company would cause Amazon irreparable harm for which Amazon has no adequate remedies at law. Accordingly, Amazon is entitled to specific performance of this Agreement or injunctive relief for any such breach. Company waives all claims for damages by reason of the wrongful issuance of an injunction and acknowledges that its only remedy in that case is the dissolution of that injunction. Company and any Subcontractor or third party utilized by it will have no lien, and Company hereby waives any right to any lien upon any shipment or portion thereof.

10.5    Construction/Counterparts. The section headings of this Agreement and of any Service Orders are for convenience only and have no interpretive value. This Agreement may be executed by facsimile and in one or more counterparts that together will constitute one and the same agreement.

10.6    Survival. The following provisions survive termination or expiration of this Agreement: Reports, Audits and Record Retention (Section 1.2), Term (Section 3), Representations and Warranties (Section 4), Confidentiality/Publicity (Section 5), Defense/Indemnity (Section 6), Insurance (Section 8), and General (Section 10).

10.7    Entire Agreement. This Agreement, the Nondisclosure Agreement (if any), together with all associated exhibits and schedules, which are incorporated by this reference, constitute the complete and final agreement of the parties pertaining to the Carrier Services and supersede the parties' prior agreements, understandings and discussions relating to the Carrier Services. No modification of this Agreement is binding unless it is in writing and signed by Amazon and Company.

The parties may use standard business forms, including bills of lading, proof of delivery documents and invoices, but use of such forms is for convenience only and does not alter the provisions of this Agreement even if signed by either or both parties. NEITHER PARTY WILL BE BOUND BY, AND EACH SPECIFICALLY OBJECTS TO, ANY PROVISION THAT IS DIFFERENT FROM OR IN ADDITION TO THIS AGREEMENT (WHETHER PROFFERED VERBALLY OR IN ANY QUOTATION, INVOICE, SHIPPING DOCUMENT, ACCEPTANCE, CONFIRMATION, CORRESPONDENCE, TARIFF, CIRCULAR OR OTHERWISE).

### [THIS SPACE INTENTIONALLY LEFT BLANK]

47

This Agreement is signed by duly authorized representatives of the parties below, effective as of the Effective Date.

AMAZON:

**Amazon Fulfillment Services, Inc.**

By: _____

Name: GIRISH LAKSHMAN

Title: VP WW TRANSPORTATION

Date Signed: 9/5/07

COMPANY:

**General Freight Services, Inc.**

By: _____

Name: Gregory Sebolt

Title: President

Date Signed: 9/6/2007

Amazon Fulfillment Services, Inc.
Attention: Transportation Director
(if by USPS):
    P.O. Box 81226
    Seattle, WA 98108-1226
(if by courier):
    1200 12th Ave. S., Suite 1200
    Seattle, WA 98144-2734
Facsimile: 206-266-2009;

*Also*: Attention: General Counsel
(same P.O. box and courier address)
Facsimile: 206-266-1440

General Freight Services, Inc.
Attention: Transportation Director
Six Concourse Parkway, Ste 1750

Atlanta GA 30328
(if by courier):
Six Concourse Parkway, Ste 1750

Atlanta GA 30328

Facsimile: 404-636-4650

**EXHIBIT A**

**Transportation Fees & Expenses; SLA's**

I.   **Definitions**

1.   "Amazon FC" means an Amazon Fulfillment Center.

2.   "Transload Facility" means a facility owned, operated, or utilized by Company for cross docking Shipments.

3.   "Transload" means the services described in Section 1.3 of Exhibit B.

4.   "Fuel Surcharge" means the fuel surcharge calculated in accordance with Section IV of this Exhibit A.

5.   "Net Verification Service" means physical verification of the quantity of goods in a carton as directed by Amazon.

5.   "Shipment" means a set of items at case or pallet quantity moving from a Vendor to an Amazon FC, transportation of which is provided by Company.

6.   "Vendor" means a third party supplier to Amazon.

## II.    Fees

### A.  "Door-to-Door" Domestic Line Haul Pricing**

Company will transport goods from the Transload Facility in the Origin City to the Amazon FC located in the applicable destination at the rates specified in the below table.  Company will utilize Standard Intermodal 53' Service or Road-Rail Expedited 53' Service as directed by Amazon.

Origin City: TACOMA, WA*

| Amazon FC Located in Following Destination | State | "Standard" Intermodal 53' Service (per container)** | Transit Time | Road-Rail Expedited 53' Service (per container)** | Transit Time |
|---|---|---|---|---|---|
| NEW CASTLE | DE | $2,555.00 | 12 days | $2,637.00 | 7 days |
| COFFEYVILLE | KS | $1,978.00 | 7 days | $2,160.00 | 3.5 days |
| CAMPBELLSVILLE | KY | $2,060.00 | 9 days | $2,556.00 | 5 days |
| HEBRON | KY | $1,778.00 | 9 days | $2,300.00 | 5 days |
| LEXINGTON | KY | $1,978.00 | 9 days | $2,519.00 | 5 days |
| LOUISVILLE | KY | $1,764.00 | 9 days | $2,276.00 | 5 days |
| RENO | NV | N/A | | $1,188.00 | 2 days |
| CARLISLE | PA | $2,576.00 | 12 days | $2,644.00 | 7 days |
| CHAMBERSBURG | PA | $2,608.00 | 12 days | $2,676.00 | 7 days |
| LESIWBERRY | PA | $2,556.00 | 12 days | $2,624.00 | 7 days |
| IRVING | TX | $2,390.00 | 10 days | $2,442.00 | 5.25 days |

\* Tacoma, WA. Zone to include, Tacoma, WA., Fife, WA. Lakewood, WA.
\** Above rates subject to the Fuel Surcharge

Additional Amazon Fulfillment Center Locations may be added as mutually agreed in writing by the parties.

Door-to-Door Domestic Line Haul rates specified above are effective from the Effective Date through April 1, 2008. The parties will mutually agree in writing on revised rates for the above services provided after April 1, 2008.

Company may adjust the above Door-to-Door Domestic Line Haul rates if Company is subject to additional mandatory surcharges and mandatory service charges resultant in increased cost to Company (e.g. increased port surcharges, railroad lane adjustments) in providing the Carrier Services, provided that, (i) Company will take all reasonable steps to mitigate and minimize the extent to which it is required to pay such surcharges and/or service charges, (ii) the resulting cost increase to Company, and no more, shall be passed on to Amazon, and (iii) Company will provide Amazon with copies of all documents establishing such surcharges and/or service charges.

**B. Transload and Drayage Fees.**

Company will provide the Transload and Drayage services at the rates specified in the below table.

| Service | Fee |
|---|---|
| Transload Service (per 40' container with 1500 cartons or less) | $370.00 |
| Transload Service (per 40' container with more than 1500 cartons) | $370.00 + $0.20 per carton in excess of 1500 |
| Drayage from Port of Tacoma to Transload Facility* | $125.00 per 40' container |

* Subject to Fuel Surcharge

**C. Additional Carrier Services and Fees**

From time to time Amazon may request Company to perform the services described in the table below ("Additional Carrier Services"). Additional Carrier Services will be charged at the rates specified below.

| Transportation Services | Fee |
|---|---|
| In Transit Storage at Transload Facility (up to 5 days) | No charge |
| In Transit Storage at Transload Facility ( over 5 days) | $1.75 per pallet for each day over 5 days |
| Printing and Affixing UCC 128 label | $0.14 per carton |
| Drayage from Port of Seattle (excluding Terminal 18)* | $ 175 per 40' container |
| Drayage from Terminal 18 at Port of Seattle* | $ 225 per 40' container |
| Net Verification Service | $0.35 per carton |

* Subject to Fuel Surcharge

### III.   Fuel Surcharge

The Weekly Retail On-Highway Diesel Prices' National U.S. Index, issued by the Department of Energy (DOE) each Monday, will be the weekly diesel fuel cost used <u>for loads picking up the following Tuesday through Monday</u>.  If the fuel index is not issued on Monday, the next index issued will be used.

To determine the applicable fuel adjustment, multiply the applicable door-to-door domestic linehaul rate or drayage rate specified in Section II above by the applicable Adjustment Factor percentage in the table listed below.  Fractions of less than one-half cent will be dropped; fractions of one half cent or greater will be increased to the next whole cent.

**Fuel Surcharge Schedule**

| National Fuel Surcharge Table | | | | | Adjustment Factor |
|---|---|---|---|---|---|
| Low Cents (per Gal.) | | High Cents (per Gal.) | | | |
| $ | 1.52 | $ | 1.56 | | 6.50% |
| $ | 1.56 | $ | 1.60 | | 7.00% |
| $ | 1.60 | $ | 1.64 | | 7.50% |
| $ | 1.64 | $ | 1.68 | | 8.00% |
| $ | 1.68 | $ | 1.72 | | 8.50% |
| $ | 1.72 | $ | 1.76 | | 9.00% |
| $ | 1.76 | $ | 1.80 | | 9.50% |
| $ | 1.80 | $ | 1.84 | | 10.00% |
| $ | 1.84 | $ | 1.88 | | 10.50% |
| $ | 1.88 | $ | 1.92 | | 11.00% |
| $ | 1.92 | $ | 1.96 | | 11.50% |
| $ | 1.96 | $ | 2.00 | | 12.00% |
| $ | 2.00 | $ | 2.04 | | 12.50% |
| $ | 2.04 | $ | 2.08 | | 13.00% |
| $ | 2.08 | $ | 2.12 | | 13.50% |
| $ | 2.12 | $ | 2.16 | | 14.00% |
| $ | 2.16 | $ | 2.20 | | 14.50% |
| $ | 2.20 | $ | 2.24 | | 15.00% |
| $ | 2.24 | $ | 2.28 | | 15.50% |
| $ | 2.28 | $ | 2.32 | | 16.00% |
| $ | 2.32 | $ | 2.36 | | 16.50% |
| $ | 2.36 | $ | 2.40 | | 17.00% |
| $ | 2.40 | $ | 2.44 | | 17.50% |
| $ | 2.44 | $ | 2.48 | | 18.00% |
| $ | 2.48 | $ | 2.52 | | 18.50% |
| $ | 2.52 | $ | 2.56 | | 19.00% |
| $ | 2.56 | $ | 2.60 | | 19.50% |
| $ | 2.60 | $ | 2.64 | | 20.00% |
| $ | 2.64 | $ | 2.68 | | 20.50% |
| $ | 2.68 | $ | 2.72 | | 21.00% |
| $ | 2.72 | $ | 2.76 | | 21.50% |
| $ | 2.76 | $ | 2.80 | | 22.00% |
| $ | 2.80 | $ | 2.84 | | 22.50% |

| $ | 2.84 | $ | 2.88 | 23.00% |
|---|------|---|------|--------|
| $ | 2.88 | $ | 2.92 | 23.50% |
| $ | 2.92 | $ | 2.96 | 24.00% |
| $ | 2.96 | $ | 3.00 | 24.50% |
| $ | 3.00 | $ | 3.04 | 25.00% |
| $ | 3.04 | $ | 3.08 | 25.50% |
| $ | 3.08 | $ | 3.12 | 26.00% |
| $ | 3.12 | $ | 3.16 | 26.50% |
| $ | 3.16 | $ | 3.20 | 27.00% |
| $ | 3.20 | $ | 3.24 | 27.50% |

In the event that the Weekly Retail On-Highway Diesel Prices' National U.S. Index exceeds $3.24, then the fuel surcharge percentage shall rise an additional 0.50% for each $0.04 increase in diesel fuel prices.

US General Freight Transportation Agreement (07-09-06)FINAL   12

53

## IV.   Service Level Agreements (SLAs)

**1. Transit Times from Pickup to Amazon FC:**  Subject to the rest of this section, Company will meet the transit time requirements for delivery of Shipments to the applicable Amazon FC as set forth in Section II of this Exhibit A ("Transit Time Requirements").  The transit times will be based on a direct route from the Transload Facility to the applicable Amazon FC location.  The date on which the Shipment is picked up will be considered Day 0, regardless of time of pickup, and the number of days in the transit times are business days (Monday through Friday).  Amazon requires that delivery of Shipments to Amazon FCs occur within 30 minutes of scheduled delivery appointment time.   The minimum service level for this metric is 99% compliance.

Company will not be expected to meet the Transit Time Requirements to the extent that doing so is not practical in light of the business rules established, or other requests made, by Amazon.  For example, Amazon may establish a rule regarding frequency of truck load departures from the Transload Facility, or Amazon may request that Company expedite a Shipment.

In addition, Amazon requires that pickups must occur within 120 minutes of the scheduled pickup. The minimum service level for this metric is 99.4% compliance.

**2. Throughput Times for Drayage and Transload:**  Subject to the rest of this section, Company will meet the below time requirements for drayage and transload of containers ("Drayage and Transload Time Requirements").

| Time | Service |
|------|---------|
| 4 hours | Drayage of container, from time of release by freight forwarder to placement at Transload dock |
| 24 hours | Transload of product from ocean container into domestic equipment |

The minimum service level for this metric is 99% compliance.

Company will not be expected to meet the Drayage and Transload Requirements to the extent that doing so is not practical in light of other requests made by Amazon.  For example, Amazon may require additional labeling or net verification quantity counts to maintain customs compliance.

**3. Overage, Shortage &Damage (OS&D).**  Company agrees that the number of Shipments containing an overage or a shortage, or which are lost or damaged in domestic intermodal transportation, (in whole or in part) ("OS&D Shipments") will be no more than six-tenths of one percent (.6%) of the total number of Shipments tendered to Company per quarter. Shortages, Overages, Lost or Damaged goods and resultant product condition due to international ocean transportation and carriage, will be noted by Company's Transload facility and notification of exceptions provided to Amazon, allowing Amazon to pursue OS&D rules with Ocean vendor.

**4. Failure to Meet SLAs.**  In the event of failure by Company to meet the service levels set forth in this Agreement, the parties agree to mutually consult regarding an action plan to improve performance.  Repeated failure to meet these service levels will constitute a material breach of this Agreement.

# EXHIBIT B

## Carrier Services

1. **Services**

    1.1. Definitions.

    1.1.1. "<u>Transload Facility</u>" means a facility owned, operated, or utilized by Company for cross docking shipments.

    1.1.2. "<u>Shipment</u>" means a set of items at container quantity moving from a Vendor to an Amazon FC, transportation of which is facilitated by Company.

    1.2. Services.   Company will provide the following services as required to transport and track Amazon Shipments from ports of entry specified by Amazon to Amazon FCs located in the United States, potentially going through Company's Transload Facility located in the United States, while meeting the Service levels described in <u>Exhibit A</u>

    1.2.1. Pickup, receiving, loading, sorting, segregating, transporting, labeling, tracking, unloading, route management, load management, load consolidation, reporting and other transportation and transportation-related services described in this <u>Exhibit B</u>.

    1.2.2. Set up and oversee the transportation organization and facilitation system

    1.2.3. Schedule, monitor and coordinate carriers and routing

    1.2.4. Monitor and coordinate cross dock functions

    1.2.5. Optimize volume

    1.2.6. Report exceptions

    1.2.7. Analyze transportation problems and missed metrics (defects)

    1.3. Transload Services

    1.3.1. Company will arrange all Transload space, dock space, storage and other services as required to accommodate the transportation and volume of Shipments.

    1.3.1.1. The parties will mutually agree on Transload locations and facilities.

    1.3.1.2. Company will disclose to Amazon at the time of proposing a Transload facility whether such facility is operated by Company or contracted from another provider.

    1.3.2. Transload Services include, but are not limited to:

    1.3.2.1. Receive EDI ASN transmission from the freight forwarder;

    1.3.2.2. Dray the container from the port to the transload facility within 4 hours of release;

    1.3.2.3. Adhere to the Amazon.com Customs Compliance Receiving Process

    1.3.2.3.1.   Verify the container seal against the seal # recorded on the House Bill of Lading (HBL)

    1.3.2.3.2.   Verify quantity counts by ASIN against the container manifest

    1.3.2.3.3.   Notify Amazon of any overages, shortages, or damages (OS&D);

    1.3.2.4. Using carton markings and/or instructions from Amazon.com, segregate cartons by destination FC;

    1.3.2.5. Adhere to the shipment preparation guidelines in the Amazon.com Vendor Operations Manual for floor-loading or palletization of shipments to load shipments into intermodal containers;

    1.3.2.6. Send EDI ASN to Amazon for newly created intermodal shipment;

    1.3.2.7. Schedule delivery appointments using the Amazon.com appointment form for each intermodal container with Amazon FCs via email;

    1.3.2.8. Coordinate transport and delivery of intermodal containers to meet the scheduled delivery appointments at Amazon FCs;

    1.3.2.9. Upon request, provide 5 free days of in-transit storage and additional days as needed at prices specified in Exhibit A;

    1.3.2.10.   Upon request, perform additional U.S. Customs compliance procedure of Net Verification of inner quantities at prices specified in Exhibit A;

    1.3.2.11.   Upon request, perform ad-hoc transportation services as needed at rates to be mutually agreed upon by the parties.

## 2. System

Company will use a transportation management system ("TMS") to manage, monitor and control all Amazon Shipments in all phases of performing the Services. Company will configure a system which will provide a baseline evaluation for each transport activity and service element and provide a plan and time frame on how and when the Company will meet the terms of the Agreement. The TMS will include, but not be limited to:

2.1. A web-based system for scheduling and reporting transport activities, including:

    2.1.1. carrier assignment

    2.1.2. current Shipment status (carrier in-transit to pick up, freight loading, freight in transit, freight delivered, freight unloaded),

    2.1.3. status, summary and exception reporting

    2.1.4. problem anticipation – providing sufficient time for escalation and resolution

    2.1.5. Shipment data

2.2. A system to respond to Amazon's pick up requests via electronic transactions (for example, EDI 204).

    2.2.1. A system to generate or retransmit shipment status via electronic transactions (for example, EDI 214). As a minimum, shipment status messages shall be transmitted daily or upon change in status.

    2.2.2. A system to list, sort and summarize active Shipment information (for example, identify all active loads that include books destined for an Amazon FC)

    2.2.3. A data collection system that tracks Shipment data, cost data, performance and key metric indicators for each transport activity.

2.3. Program. Company will use its best business judgment to design and implement proactive programs to facilitate the Carrier Services in each of the following areas, which will be approved by Amazon:

2.3.1. selecting and retaining Carriers

2.3.2. arranging for time critical and low defect transport

2.3.3. measuring key metrics such as carrier transit time, overages, shortages and damages

2.3.4. determining statistical performance level and variability of each key metric

2.3.5. communicating Shipment data and status

2.3.6. tracking capacity availability

2.3.7. generating savings against benchmark through optimal shipment planning

2.3.8. continuous improvement in each key metric

2.3.9. a strategy for meeting all SLAs

The purpose of each program is to improve performance, reduce Amazon's costs, and achieve continuous improvement in efficiency and savings to Amazon with this solution. The foregoing programs, and results within each program, will be reviewed quarterly by Company and Amazon in order to facilitate the improvement and efficiency of the Carrier Services.

3. **Performance Expectations**

3.1. Company will adhere to all performance expectations, including:

3.1.1. Dray container from port to Transload Facility within 4 hours of release. For example, if a container is released at 10:00 AM on Tuesday, Company must arrange for the pick up of the Shipment prior to 2:00 PM on that Tuesday, unless otherwise mutually agreed by the Vendor and Company.

3.1.2. Complete devan and load out at Transload Facility within 24 hours of arrival at Transload Facility. For example, if a container arrives at 10:00 AM on Tuesday, Company must complete the Transload of the Shipment prior to 10:00 AM the next Wednesday, unless otherwise mutually agreed by Vendor and Company.

3.1.3. Delivery of Shipments to Amazon FCs within 30 minutes of scheduled delivery appointment time. For example, if the delivery appointment is scheduled for 3:00 PM on Tuesday, Company must arrange for the delivery of the Shipment to the Amazon FC between 2:30 PM and 3:30 PM, unless otherwise agreed by Amazon and Company.

3.1.4. Company will process shipment status update messages from carrier and provide Shipment status messaging to Amazon for the following Shipment events

3.1.4.1. Shipment pick up from Vendor

3.1.4.2. Shipment delivery to Transload Facility

3.1.4.3. Shipment pick up from Transload Facility

3.1.4.4. Shipment delivery to Amazon FC

3.1.5. Shipment messages will be transmitted to Amazon in the agreed upon format as soon as possible, but in no case later than 18 hours after the actual event.

4. **Reports and Electronic Communications**

4.1. Company will use it best business judgment to develop communications, reporting and data extracts, as required to facilitate Amazon's transportation needs.

4.1.1. Company will provide weekly, monthly and quarterly reporting or data extract as required by Amazon to summarize all Shipment status, performance and costs.

4.1.2. Company will submit all reports or data sets in a format specified by Amazon, which will allow evaluation and performance analysis by Amazon.

4.1.3. Company will provide summary reports or data sets, which will summarize performance and costs with exceptions identified and the root cause for all problems and defects identified.

4.1.4. Company's communications will comply with industry standards providing sufficient information to manage, monitor and control Shipment routing.

4.1.5. Company's communications will be transmitted in a timely manner allowing sufficient time to accommodate planning and load processing.

4.1.6. Company will provide Amazon with real time electronic information (raw data).

4.1.7. Status reports will be made available via email and real-time EDI transmissions.

4.1.8. Amazon will be able to access (either via Company's website or through customer service) the most recent status and physical location of a shipment.

4.1.8.1. Inbound location shall be accurate within $\pm$ 4 hours

4.1.8.2. Outbound location shall be accurate within $\pm$ 12 hours of most recent milestone.

4.1.8.3. Company will update the status for each milestone (e.g., in transit, tendered for delivery, etc.), each time the status changes.

4.2. Carrier Services reporting:

4.2.1. Company will provide reporting or data extracts, to Amazon as requested, which is expected to include the following representative data:

4.2.1.1. Containers picked up from port and transloaded;

4.2.1.2. Cost of transload services by container;

4.2.1.3. Intermodal container utilization by lane;

4.2.1.4. Intermodal cost per lane;

4.2.1.5. Recap of all Accessorial Charges by Vendor and destination Amazon FC.

4.2.1.6. Company will provide cost by lane, by class and total transportation cost to each Amazon FC.

4.2.1.7. Company will provide such reports via email or other mutually agreed method.

4.2.1.8. All other information will be available via EDI reporting.

4.2.2. Performance for each transportation segment, including:

4.2.2.1. Source, origin, destination, Carrier, pick up date / time, delivery date / time, miles, and load information (for example, pallet count and weight)

        4.2.2.2. Compliance with SLAs

        4.2.2.3. Performance against performance standards and key metrics

        4.2.2.4. Exceptions identified and root cause of those exceptions identified

      4.2.3. Recommend program changes.

4.3. Monthly and Quarterly statistical and summary reports or data extracts, will include, but not be limited to, the following items::

    4.3.1. Average transit time per route

    4.3.2. Transit time variability per route

    4.3.3. FC refusals of shipments and plans for improvement

    4.3.4. Loss and damage and plans for improvement

    4.3.5. SLA compliance and plans for improvement

    4.3.6. Appointment time versus arrival time and plans for improvement

    4.3.7. Billing issues and non payment

    4.3.8. Trouble shooting foreseeable problems

    4.3.9. Recommended route or process revisions

## AMENDMENT No. 1 TO TRANSPORTATION AGREEMENT

This Amendment No. 1 to Transportation Agreement (this "**Amendment**") has an effective date of August 31, 2009 (the "**Amendment Date**"), and amends that certain Transportation Agreement with an effective date of August 13, 2007 (the "**Agreement**"), between Coyote Logistics LLC, (as successor in interest to General Freight Services, Inc.,"**Broker**") and Amazon Fulfillment Services, Inc., a Delaware corporation, and its affiliates for which Carrier performs services under this Agreement (collectively "**Amazon**", and, together with Broker, the "**Parties**").

### RECITALS

Broker and Amazon have entered into the Agreement with respect to the Broker's provision of common carrier logistics and transportation services to Amazon. Broker and Amazon desire to amend the Agreement to adjust the Rates, expand the Services and adjust the payment terms.

### TERMS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **Amendments.**

   1.1   <u>Section 2.2</u> of the Agreement is deleted and replaced in its entirety with the following:

   "2.2   <u>Invoices</u>. Company will provide weekly electronic invoices that include fees for the prior week. Company will provide each invoice in a mutually agreeable format, provided that at Amazon's election, Company will issue separate invoices for each Amazon affiliate for which it provides Service (the parties agreeing that each such affiliate is solely responsible for payment for Broker Services provided to it under this Agreement); and (ii) each invoice will include sufficient information for Amazon to determine the accuracy of the amounts, including but not limited to, copies of the relevant bill of lading and proof of delivery (if applicable). Amazon will pay Company's properly submitted, and undisputed portions of, invoices within 40 days of receipt. Amazon has no obligation to pay any Fees or Expenses invoiced more than 60 days after they accrue ("Stale Fees"). If and to the extent Amazon directly causes Company to delay its provision of Company's properly submitted invoice to Amazon for the Stale Fees beyond 60 days from the date on which the Stale Fees accrued, then Amazon will pay undisputed portions of the Stale Fees on Company's properly submitted invoices, so long as Amazon receives Company's properly submitted invoice for the Stale Fees within 14 days of Amazon's cure of the cause for the delay in invoicing the Stale Fees."

   1.2   The first sentence of <u>Section 3</u> of the Agreement is deleted and replaced in its entirety with the following:

   "The term of this Agreement will begin on the Effective Date and will continue until August 31, 2010 ("<u>Initial Term</u>"); *provided, however*, Amazon may terminate this Agreement at any time without cause on 30 days advance notice to Company."

   1.3   <u>Exhibit A</u> to the Agreement is hereby deleted and replaced in its entirety with **Attachment A** to this Amendment.

Amazon Fulfillment Services, Inc.
Confidential



Page 1 of 9
446,874-1

1.4  Section 9.2 of the Agreement is deleted and replaced in its entirety with the following:

"9.2  Subcontractors.  Notwithstanding the existence or terms of any subcontract, Company will remain responsible for the full performance of the Services.  Company may contract subcontract with Carriers to perform Services under this Agreement.  The terms and conditions of this Agreement are binding upon Company's agents, subcontractors (including Carriers) and affiliates ("Subcontractors").  Company (a) will ensure that all Subcontractors comply with this Agreement and (b) will be responsible for all acts, omissions, negligence and misconduct of such Subcontractors.  Company will also ensure that all Subcontractors effectively and irrevocably: waive any lien upon (or other right with respect to) the products transported, regardless of whether such Subcontractor would otherwise be entitled to such lien or other rights pursuant to contract or applicable law; and waive any claim (including, without limitation, for amounts owed for delivery services) against Amazon and its affiliates.  Without in any way limiting Company's obligations or Amazon's rights under Section 6 above, if any Subcontractor asserts any claim, demand, suit, or action ("Subcontractor Claim") against Amazon and/or its affiliates, and Company is undergoing any bankruptcy proceeding: Amazon may at its sole discretion, but is not obligated to, defend and/or settle such Subcontractor Claim at Company's cost and expense; and for the avoidance of doubt, if Amazon incurs or pays any damages, liabilities, losses, reasonable costs and expenses, or any other reasonable amounts relating to such Subcontractor Claim, Amazon may set off such amounts in full against any amounts Amazon owes to Company and/or demand immediate full reimbursement from Company."

2.  **Notice.**  As of the Amendment Date, the Company's notice address pursuant to Section 10.3 of the Agreement will be as follows (unless the Company subsequently changes its notice address pursuant to Section 10.3 of the Agreement):

> "Coyote Logistics LLC
> Attention: Transportation Director / Kelly Johnson
> 4400 Alexander Drive
> Alpharetta, GA 30022
> Facsimile: 678-775-5195"

3.  **Consent to Transfer.**  Amazon consents to the Company's transfer of the Agreement pursuant to the operation of law from General Freight Services, Inc., to Coyote Logistics, LLC.

4.  **Defined Terms.**  Unless otherwise expressly defined in this Amendment, all capitalized terms herein have the meanings ascribed to them in the Agreement.

5.  **Effectiveness of Agreement.**  Except as expressly provided herein, nothing in this Amendment waives or modifies any of the provisions of the Agreement, or any amendment or addendum thereto.  In the event of any conflict between the Agreement, this Amendment or any other amendment or addendum thereof, the document latest in time will prevail.

6.  **Other Terms.**  Except as provided in this Amendment, all other terms and conditions of the Agreement remain in full force and effect, and the Parties acknowledge that those terms and conditions are in full force and effect as of the date of this Amendment.

7.  **Counterparts and Facsimile Delivery.**  This Amendment may be executed in two or more counterparts, each of which will be deemed an original and all of which taken together will be deemed to constitute one and the same document.  The Parties may sign and deliver this Amendment by facsimile transmission.

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]* 

IN WITNESS WHEREOF, Carrier and Amazon have executed this Amendment.

"Broker"

Coyote Logistics LLC

_By (authorized signature)_

GREGORY D. Sobil
By: Name, Title (Print or Type)

4400 Alexander Drive
Address

Alpharetta, GA. 30022
Address

8/31/2011
Date Signed

"Amazon"

Amazon Fulfillment Services, Inc.

_By (authorized signature)_

_By: Name, Title (Print or Type)_

_Date Signed_

Amazon Fulfillment Services, Inc.
Confidential

LEGAL

Page 3 of 9
446,874-1

62

IN WITNESS WHEREOF, Carrier and Amazon have executed this Amendment.

"Broker"

**Coyote Logistics LLC**

By (authorized signature)
_____

By: Name, Title (Print or Type)
_____
4400 Alexander Drive
Address
Alpharetta, GA. 30022
Address
_____

Date Signed

"Amazon"

**Amazon Fulfillment Services, Inc.**

By (authorized signature)
Girish Lakshman, VP-Transportation
By: Name, Title (Print or Type)
9-2-09
Date Signed


63

**EXHIBIT A**

**Transportation Fees & Expenses; SLA's**

I.   Definitions

    1.   "Amazon FC" means an Amazon Fulfillment Center.

    2.   "Transload Facility" means a facility owned, operated, or utilized by Company for cross docking Shipments.

    3.   "Transload" means the services described in Section 1.3 of Exhibit B.

    4.   "Fuel Surcharge" means the fuel surcharge calculated in accordance with Section IV of this Exhibit A.

    5.   "Net Verification Service" means physical verification of the quantity of goods in a carton as directed by Amazon.

    5.   "Shipment" means a set of items at case or pallet quantity moving from a Vendor to an Amazon FC, transportation of which is provided by Company.

    6.   "Vendor" means a third party supplier to Amazon.



II. Fees

**A. "Door-to-Door" Domestic Line Haul Pricing****
Company will transport goods from the Transload Facility in the Origin City to the Amazon FC located in the applicable destination at the rates specified in the below table. Company will utilize Standard Intermodal 53' Service or Road-Rail Expedited 53' Service as directed by Amazon.

| Coyote Logistics - CLLQ 2009 - 2010 Rates<br>From Tacoma, WA. to FC's | | | | | | |
|---|---|---|---|---|---|---|
| FC Code | City | State | TRANSIT | MODE | RATE | CPM |
| IND2 | Plainsfield | IN | 5 Days | Rail | $1,692.00 | $0.760 |
| PHL4 | Carlisle | PA | 7 Days | Rail | $2,346.00 | $0.860 |
| CVG2 | Hebron | KY | 5 Days | Rail | $1,892.00 | $0.790 |
| DFW1 | Irving | TX | 5 Days | Linehaul | $2,663.00 | $1.260 |
| PHL5 | Lewisberry | PA | 7 Days | Rail | $2,362.00 | $0.860 |
| IND1 | Whitestown | IN | 5 Days | Rail | $1,692.00 | $0.760 |
| SDF1 | Campbellsville | KY | 5 Days | Rail | $2,181.00 | $0.880 |
| PHX5 | Goodyear | AZ | 3 Days | Linehaul | $1,998.00 | $1.370 |
| RNO1 | Fernley | NV | 2 Days | Linehaul | $888.00 | $1.250 |
| CVG3 | Hebron | KY | 5 Days | Rail | $1,892.00 | $0.790 |
| PHX3 | Phoenix | AZ | 3 Days | Linehaul | $1,994.00 | $1.350 |
| LEX1 | Lexington | KY | 5 Days | Rail | $2,173.00 | $0.880 |
| TUL1 | Coffeyville | KS | 4 Days | Linehaul | $2,444.00 | $1.230 |
| PHL1 | New Castle | DE | Service from Tacoma to FC not required at this time | | | |
| AVP1 | Hazelton | PA | Service from Tacoma to FC not required at this time | | | |
| CVG1 | Hebron | KY | Service from Tacoma to FC not required at this time | | | |

* Tacoma, WA. Zone to include, Tacoma, WA., Fife, WA. Lakewood, WA.
** Above rates subject to the Fuel Surcharge
Additional Amazon Fulfillment Center Locations may be added as mutually agreed in writing by the parties.

Door-to-Door Domestic Line Haul and Rail service rates specified above are effective from the Effective Date through March 31st, 2011. The parties will mutually agree in writing on revised rates for the above services provided after September 1st, 2009.

Company may adjust the above Door-to-Door Domestic Line Haul rates changed only if Company is subject to 5.2additional mandatory surcharges and mandatory service charges resultant in increased cost to Company (e.g. increased port surcharges, railroad lane adjustments) in providing the Services, provided that, (i) Company will take all reasonable steps to mitigate and minimize the extent to which it is required to pay such surcharges and/or service charges, (ii) the resulting cost increase to Company, and no more, shall be passed on to Amazon, and (iii) Company will provide Amazon with copies of all documents establishing such surcharges and/or service charges.

**B. Transload and Drayage Fees.**

Company will provide the Transload and Drayage services at the rates specified in the below table.

| Service | Fee |
|---|---|
| Transload Service (per 20' container with 1-750 cartons*) | $294.00 |
| Transload Service (per 40' container with 1-1500 cartons*) | $370.00 |
| Transload Service (per 45' container with 1-1500 cartons*) | $390.00 |
| Drayage from Port of Tacoma to Transload Facility* | $135.00 per 40' container |

\* Per carton additional charge when marine container exceeds above limit, = $0.19 per carton
\* Subject to Fuel Surcharge

**C. Additional Services and Fees**

From time to time Amazon may request Company to perform the services described in the table below ("Additional Services"). Additional Services will be charged at the rates specified below.

| Service | Fee |
|---|---|
| Storage at Transload Facility (up to 5 days) | No charge |
| Storage at Transload Facility ( over 5 days) | $1.75 per pallet for each day over 5 days |
| Printing and Affixing UCC 128 label | $0.14 per carton |
| Drayage from Port of Seattle (excluding Terminal 18)* | $ 178 per 40' container |
| Drayage from Terminal 18 at Port of Seattle* | $ 235 per 40' container |
| Net Verification Service | $0.35 per carton |

\* Subject to Fuel Surcharge



### III.    Fuel Surcharge

The Weekly Retail On-Highway Diesel Prices' National U.S. Index, issued by the Department of Energy (DOE) each Monday, will be the weekly diesel fuel cost used for loads picking up the following Tuesday through Monday. If the fuel index is not issued on Monday, the next index issued will be used.

To determine the applicable fuel adjustment, multiply the applicable door-to-door domestic linehaul, rail or drayage rate specified in section II, by the applicable Adjustment Factor in Cents-Per-Mile from this item's table.

Table based off of the Weekly DOE National Index to all FC's except RNO1, PHX3 & PHX; where the use of the Weekly DOE West Coast Index will be used.

#### Fuel Surcharge Schedule

| Highway Diesel Price When Fuel Range is: | | Surcharge is: (CPM) |
|---|---|---|
| 0 | 1.239 | $    - |
| 1.24 | 1.279 | $    - |
| 1.28 | 1.319 | $    - |
| 1.32 | 1.359 | $  0.005 |
| 1.36 | 1.399 | $  0.010 |
| 1.40 | 1.439 | $  0.015 |
| 1.44 | 1.479 | $  0.020 |
| 1.48 | 1.519 | $  0.025 |
| 1.52 | 1.559 | $  0.030 |
| 1.56 | 1.599 | $  0.350 |
| 1.60 | 1.639 | $  0.040 |
| 1.64 | 1.679 | $  0.045 |
| 1.68 | 1.719 | $  0.050 |
| 1.72 | 1.759 | $  0.055 |
| 1.76 | 1.799 | $  0.065 |
| 1.80 | 1.839 | $  0.070 |
| 1.84 | 1.879 | $  0.075 |
| 1.88 | 1.919 | $  0.080 |
| 1.92 | 1.959 | $  0.085 |
| 1.96 | 1.999 | $  0.090 |
| 2.00 | 2.039 | $  0.095 |
| 2.04 | 2.079 | $  0.100 |
| 2.08 | 2.119 | $  0.105 |
| 2.12 | 2.159 | $  0.110 |
| 2.16 | 2.199 | $  0.115 |
| 2.20 | 2.239 | $  0.120 |
| 2.24 | 2.279 | $  0.125 |
| 2.28 | 2.319 | $  0.130 |
| 2.32 | 2.359 | $  0.135 |

Amazon Fulfillment Services, Inc.
Confidential



| | | | |
|---|---|---|---|
| 2.36 | 2.399 | $ | 0.140 |
| 2.40 | 2.439 | $ | 0.145 |
| 2.44 | 2.479 | $ | 0.150 |
| 2.48 | 2.519 | $ | 0.155 |
| 2.52 | 2.559 | $ | 0.160 |
| 2.56 | 2.599 | $ | 0.165 |
| 2.60 | 2.639 | $ | 0.170 |
| 2.64 | 2.679 | $ | 0.175 |
| 2.68 | 2.719 | $ | 0.180 |
| 2.72 | 2.759 | $ | 0.185 |
| 2.76 | 2.799 | $ | 0.190 |
| 2.80 | 2.839 | $ | 0.195 |
| 2.84 | 2.879 | $ | 0.200 |
| 2.88 | 2.919 | $ | 0.205 |
| 2.92 | 2.959 | $ | 0.210 |
| 2.96 | 2.999 | $ | 0.215 |
| 3.00 | 3.039 | $ | 0.220 |
| 3.04 | 3.079 | $ | 0.225 |
| 3.08 | 3.119 | $ | 0.230 |
| 3.12 | 3.159 | $ | 0.235 |
| 3.16 | 3.199 | $ | 0.240 |
| 3.20 | 3.239 | $ | 0.245 |
| 3.24 | 3.279 | $ | 0.250 |
| 3.28 | 3.319 | $ | 0.255 |
| 3.32 | 3.359 | $ | 0.260 |
| 3.36 | 3.399 | $ | 0.265 |
| 3.40 | 3.439 | $ | 0.270 |
| 3.44 | 3.479 | $ | 0.275 |
| 3.48 | 3.519 | $ | 0.280 |
| 3.52 | 3.559 | $ | 0.285 |
| 3.56 | 3.599 | $ | 0.290 |
| 3.60 | 3.639 | $ | 0.295 |
| 3.64 | 3.679 | $ | 0.300 |
| 3.68 | 3.719 | $ | 0.305 |

*Exception: From Transload Facility in Washington State
to PHX3, PHX5, and RNO1-02, use DOE West Coast table*

In the event that the Weekly Retail On-Highway Diesel Prices' National U.S. Index exceeds $3.719, then the fuel surcharge will increase one-half cent for every $0.04 increase in diesel fuel prices.

Amazon Fulfillment Services, Inc.
Confidential



Page 8 of 9
446,874-1

IV.    Service Level Agreements (SLAs)

**1. Transit Times from Pickup to Amazon FC:**  Subject to the rest of this section, Company will meet the transit time requirements for delivery of Shipments to the applicable Amazon FC as set forth in Section II of this Exhibit A ("Transit Time Requirements").  The transit times will be based on a direct route from the Transload Facility to the applicable Amazon FC location.  The date on which the Shipment is picked up will be considered Day 0, regardless of time of pickup, and the number of days in the transit times are business days (Monday through Friday).  Amazon requires that delivery of Shipments to Amazon FCs occur within 30 minutes of scheduled delivery appointment time.  The minimum service level for this metric is 99% compliance.

Company will not be expected to meet the Transit Time Requirements to the extent that doing so is not practical in light of the business rules established, or other requests made, by Amazon.  For example, Amazon may establish a rule regarding frequency of truck load departures from the Transload Facility, or Amazon may request that Company expedite a Shipment.

In addition, Amazon requires that pickups must occur within 120 minutes of the scheduled pickup.  The minimum service level for this metric is 99.4% compliance.

**2. Throughput Times for Drayage and Transload:**  Subject to the rest of this section, Company will meet the below time requirements for drayage and transload of containers ("Drayage and Transload Time Requirements").

| Time | Service |
|---|---|
| 4 hours | Drayage of container, from time of release by freight forwarder to placement at Transload dock |
| 24 hours | Transload of product from ocean container into domestic equipment |

The minimum service level for this metric is 99% compliance.

Company will not be expected to meet the Drayage and Transload Requirements to the extent that doing so is not practical in light of other requests made by Amazon.  For example, Amazon may require additional labeling or net verification quantity counts to maintain customs compliance.

**3. Overage, Shortage & Damage (OS&D).**  Company agrees that the number of Shipments containing an overage or a shortage, or which are lost or damaged in domestic intermodal transportation, (in whole or in part) ("OS&D Shipments") will be no more than six-tenths of one percent (.6%) of the total number of Shipments tendered to Company per quarter.  Shortages, Overages, Lost or Damaged goods and resultant product condition due to international ocean transportation and carriage, will be noted by Company's Transload facility and notification of exceptions provided to Amazon, allowing Amazon to pursue OS&D rules with Ocean vendor.

**4. Failure to Meet SLAs.**  In the event of failure by Company to meet the service levels set forth in this Agreement, the parties agree to mutually consult regarding an action plan to improve performance.  Repeated failure to meet these service levels will constitute a material breach of this Agreement.

Amazon Fulfillment Services, Inc.
Confidential



**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT DESIGNATION**
**and**
**CASE INFORMATION COVER SHEET**
**(cics)**

In accordance with LCR82 (e), a faulty document fee of $15 will be assessed to new case filings missing this sheet pursuant to King County Code 4.71.100.

CASE NUMBER: _____

CASE CAPTION:   Amazon.com, Inc. and Amazon Fulfillment Services, Inc. v. Coyote Logistics, LLC

I certify that this case meets the case assignment criteria, described in King County LCR 82(e), for the:

___XX___   Seattle Area, defined as:

> All of King County north of Interstate 90 and including all of the Interstate 90 right-of-way; all the cities of Seattle, Mercer Island, Bellevue, Issaquah and North Bend; and all of Vashon and Maury Islands.

_____   Kent Area, defined as:

> All of King County south of Interstate 90 except those areas included in the Seattle Case Assignment Area.

_____                   _____
Signature of Petitioner/Plaintiff                                          Date

or

_Clifford W. Lindd_

Signature of Attorney for                                         5/13/2011
Petitioner/Plaintiff                                              Date

_____20771_____
WSBA Number

KING COUNTY SUPERIOR COURT
CASE ASSIGNMENT DESIGNATION
and
CASE INFORMATION COVER SHEET

Please check one category that best describes this case for indexing purposes.  Accurate case indexing not only saves time but also helps in forecasting judicial resources.  A faulty document fee of $15 will be assessed to new case filings missing this sheet pursuant to Administrative Rule 2 and King County Code 4.71.100.

**ADOPTION/PATERNITY**
- [ ] Adoption (ADP 5)
- [ ] Challenge to Acknowledgment of Paternity (PAT 5)*
- [ ] Challenge to Denial of Paternity (PAT 5)*
- [ ] Confidential Intermediary (MSC 5)
- [ ] Establish Parenting Plan-Existing King County Paternity (MSC 5)*
- [ ] Initial Pre-Placement Report (PPR 5)
- [ ] Modification (MOD 5)*
- [ ] Modification-Support Only (MDS 5)*
- [ ] Paternity, Establish/Disestablish  (PAT 5)*
- [ ] Paternity/UIFSA (PUR 5)*
- [ ] Relinquishment (REL 5)
- [ ] Relocation Objection/Modification (MOD 5)*
- [ ] Rescission of Acknowledgment of Paternity (PAT 5)*
- [ ] Rescission of Denial of Paternity (PAT 5)*
- [ ] Termination of Parent-Child Relationship (TER 5)

**APPEAL/REVIEW**
- [ ] Administrative Law Review (ALR 2)*
- [ ] DOL Implied Consent—Test Refusal –only RCW 46.20.308 (DOL 2)*

**CONTRACT/COMMERCIAL**
- [X] Breach of Contract (COM 2)*
- [ ] Commercial Contract (COM 2)*
- [ ] Commercial Non-Contract (COL 2)*
- [ ] Third Party Collection (COL 2)*

**DOMESTIC RELATIONS**
- [ ] Annulment/Invalidity (INV3)*
- [ ] with dependent children? Y / N; wife pregnant? Y / N
- [ ] Committed Intimate Relationship (CIR 3)*
- [ ] Dissolution With Children (DIC 3)*
- [ ] Dissolution With No Children (DIN 3)*
- [ ] wife pregnant? Y /  N
- [ ] Enforcement/Show Cause- Out of County (MSC 3)
- [ ] Establish Residential Sched/Parenting Plan(PPS 3)* ££
- [ ] Establish Support Only (PPS 3)* ££
- [ ] Legal Separation (SEP 3)*
- [ ] with dependent children? Y / N; wife pregnant? Y / N
- [ ] Mandatory Wage Assignment (MWA 3)
- [ ] Modification (MOD 3)*
- [ ] Modification - Support Only (MDS 3)*
- [ ] Nonparental Custody (CUS 3)*
- [ ] Out-of-state Custody Order Registration (OSC 3)
- [ ] Out-of-State Support Court Order Registration (FJU 3)
- [ ] Relocation Objection/Modification (MOD 3)*

**DOMESTIC PARTNERSHIPS-REGISTERED**
- [ ] Dissolution of Domestic Partnership With Children (DPC 3)
- [ ] Dissolution of Domestic Partnership- No Children- (DPN3)*   pregnant? Y / N
- [ ] Invalidity of Domestic Partnership (INP 3)*
- [ ] with dependent children? Y / N; pregnant? Y / N
- [ ] Legal Separation of Domestic Partnership (SPD 3)*
- [ ] with dependent children? Y / N; pregnant? Y / N

**DOMESTIC VIOLENCE/ANTIHARASSMENT**
- [ ] Certificate and Order of Discharge and for Issuance of a Separate No-Contact Order pursuant to RCW 9.94A.637.
- [ ] Civil Harassment (HAR 2)
- [ ] Confidential Name Change (CHN 5)
- [ ] Domestic Violence (DVP 2)
- [ ] Domestic Violence with Children (DVC 2)
- [ ] Foreign Protection Order (FPO 2)
- [ ] Sexual Assault Protection Order (SXP 2)
- [ ] Vulnerable Adult Protection (VAP 2)

**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT DESIGNATION**
and
**CASE INFORMATION COVER SHEET**

Please check <u>one</u> category that best describes this case for indexing purposes.

**JUDGMENT**

☐ Confession of Judgment (MSC 2)*
☐ Judgment, Another County, Abstract (ABJ 2)
☐ Judgment, Another State or Country (FJU 2)
☐ Tax Warrant (TAX 2)
☐ Transcript of Judgment (TRJ 2)

**PROPERTY RIGHTS**

☐ Condemnation/Eminent Domain (CON 2)*
☐ Foreclosure (FOR 2)*
☐ Land Use Petition (LUP 2)*
☐ Property Fairness (PFA 2)*
☐ Quiet Title (QTI 2)*
☐ Unlawful Detainer (UND 2)

**OTHER COMPLAINT/PETITION**

☐ Action to Compel/Confirm Private Binding Arbitration (MSC 2)
☐ Certificate of Rehabilitation (MSC 2)
☐ Change of Name (CHN 2)
☐ Deposit of Surplus Funds (MSC 2)
☐ Emancipation of Minor (EOM 2)
☐ Frivolous Claim of Lien (MSC 2)
☐ Injunction (INJ 2)*
☐ Interpleader (MSC 2)
☐ Malicious Harassment (MHA 2)*
☐ Other Complaint/Petition (MSC 2)*
☐ Petition for Civil Commitment (Sexual Predator) (PCC 2)
☐ Public Records Act (PRA 2)*
☐ Receivership (MSC 2)
☐ School District-Required Action Plan (SDR 2)
☐ Seizure of Property from the Commission of a Crime (SPC 2)*
☐ Seizure of Property Resulting from a Crime (SPR 2)*
☐ Structured Settlements (MSC 2)*
☐ Subpoena (MSC 2)

**PROBATE/GUARDIANSHIP**

☐ Absentee (ABS 4)
☐ Disclaimer (DSC4)
☐ Estate (EST 4)
☐ Foreign Will (FNW 4)

☐ Guardian (GDN4)
☐ Limited Guardianship (LGD 4)
☐ Minor Settlement (MST 4)
☐ Notice to Creditors – Only (NNC 4)
☐ Trust (TRS 4)
☐ Trust Estate Dispute Resolution Act/POA (TDR 4)
☐ Will Only—Deceased (WLL4)

**TORT, ASBESTOS**

☐ Personal Injury-Schroeter Goldmark (PIN 2)*
☐ Personal Injury- Other (PIN 2)
☐ Wrongful Death- -Schroeter Goldmark (WDE 2)*
☐ Wrongful Death- Other (WDE 2)

**TORT, MEDICAL MALPRACTICE**

☐ Hospital (MED 2)*
☐ Medical Doctor (MED 2)*
☐ Other Health Care Professional (MED 2)*

**TORT, MOTOR VEHICLE**

☐ Death (TMV 2)*
☐ Non-Death Injuries (TMV 2)*
☐ Property Damage Only (TMV 2)*
☐ Victims Vehicle Theft (VVT 2)*

**TORT, NON-MOTOR VEHICLE**

☐ Implants (PIN 2)
☐ Other Malpractice (MAL 2)*
☐ Personal Injury (PIN 2)*
☐ Products Liability (TTO 2)*
☐ Property Damage (PRP 2)*
☐ Property Damage –Gang (PRG 2)*
☐ Tort, Other (TTO 2)*

**WRIT**

☐ Habeas Corpus (WHC 2)
☐ Mandamus (WRM 2)**
☐ Review (WRV 2)**

£ Paternity Affidavit or Existing/Paternity is not an issue and NO other case exists in King County    * The filing party will be given an appropriate case schedule at time of filing.   ** Case schedule will be issued after hearing and findings

# Exhibit 2

FILED

11 JUN 17 PM 12:01

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 11-2-17491-3 SEA

1

2

3

4

5

6

7

8

9

10

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

11

12  AMAZON.COM, INC., and AMAZON
    FULFILLMENT SERVICES, INC., Delaware
13  corporations,

14                                Plaintiffs,

15      v.

16  COYOTE LOGISTICS, LLC, a Delaware limited
    liability company,

17                                Defendant.

18

**The Honorable Jim Rogers**

NO. 11-2-17491-3 SEA


**NOTICE OF REMOVAL TO
ADVERSE PARTY AND
SUPERIOR COURT CLERK**

**(Clerk's Action Required)**

19        YOU ARE HEREBY NOTIFIED that on June 17, 2011, Defendant, Coyote Logistics,

20  LLC ("Coyote"), filed in the U.S. District Court for the Western District of Washington its

21  Notice of Removal of the above-captioned cause of action.  A copy of the Notice of Removal

22  is attached hereto.

23  /////

24  /////

25  /////

26

NOTICE OF REMOVAL - 1

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

651981.01

75

1     DATED this 17th day of June, 2011.

2                          RYAN, SWANSON & CLEVELAND, PLLC

3

4                   By _____

5                      John R. Ruhl, WSBA #8558
                     Amanda C. Bley, WSBA #42450

6                      Attorneys for Defendant

7                      1201 Third Avenue, Suite 3400
                     Seattle, Washington 98101-3034

8                      Telephone: (206) 464-4224
                     Facsimile: (206) 583-0359

9                      ruhl@ryanlaw.com
                     bley@ryanlaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF REMOVAL - 2

651981.01



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

# Exhibit 3

1

2

3

4

5

6

7

8

9

10

11

12                   UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
13                            AT SEATTLE

14   AMAZON.COM, INC., and AMAZON
     FULFILLMENT SERVICES, INC., Delaware
15   corporations,
                                                    NO. 2:11-cv-01015-RSL
16                                   Plaintiffs,
                                                    COYOTE LOGISTICS, LLC'S
17          v.                                      ANSWER AND AFFIRMATIVE
                                                    DEFENSES TO PLAINTIFFS'
18   COYOTE LOGISTICS, LLC, a Delaware limited      COMPLAINT, AND
     liability company,                             THIRD-PARTY COMPLAINT
19                                                  AGAINST CP TRANSPORT, INC.
                              Defendant and
20                       Third-Party Plaintiff,

21          v.

22   CP TRANSPORT, INC., a Florida corporation,

23                        Third-Party Defendant.

24

25

26

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 1

654536.02

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

COMES NOW Defendant Coyote Logistics, LLC, (**"Coyote"**), through its attorneys of record, and hereby answers Amazon.Com, Inc.'s (**"Amazon"**) and Amazon Fulfillment Services, Inc.'s (**"AFS"**) (collectively, **"Plaintiffs"**) Complaint as follows:

1.      In answer to paragraph 1 of Plaintiffs' Complaint, Coyote admits that a true and exact copy of the Transportation Agreement that General Freight Services, Inc. and Amazon Fulfillment Services, Inc. entered into and later amended in writing on or about August 31, 2009 (hereinafter collectively referred to as the **"Amazon-Coyote Agreement"**) is attached to Plaintiffs' Complaint as Exhibit A.  Coyote admits that jurisdiction is proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 49 U.S.C. § 14706, as well as 28 U.S.C. § 1332 and 28 U.S.C. § 1367.  Coyote admits that venue is proper pursuant to 28 U.S.C. § 1391.

2.      In Answer to paragraph 2 of Plaintiffs' Complaint, Coyote is without information sufficient to form a belief as to the truth or falsity of the allegations contained therein and therefore denies the same.

3.      In Answer to the first and second sentence of paragraph 3 of Plaintiffs' Complaint, Coyote admits them.  To the extent the terms of the Amazon-Coyote Agreement or controlling law conflict with the allegations of paragraph 3, such allegations are denied.  Except to the extent admitted herein, the allegations in paragraph 3 are denied.

4.      In Answer to paragraph 4 of Plaintiffs' Complaint, the Amazon-Coyote Agreement speaks for itself.  To the extent the Amazon-Coyote Agreement's terms or controlling law defining Coyote's obligations conflicts with the allegations of paragraph 4, such allegations are denied.  Except to the extent admitted herein, the allegations in paragraph 4 are denied.

5.      In Answer to paragraph 5 of Plaintiffs' Complaint, the Amazon-Coyote Agreement speaks for itself.  To the extent the Amazon-Coyote Agreement's terms or

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT  - 2

654536.02



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

79

controlling law defining Coyote's obligations conflicts with the allegations of paragraph 5, such allegations are denied. Except to the extent admitted herein, the allegations in paragraph 5 are denied.

6.      In Answer to paragraph 6 of Plaintiffs' Complaint, the Amazon-Coyote Agreement speaks for itself. Coyote denies that any single sentence of that paragraph is explained or identified by italics. Coyote further answers that to the extent that the Amazon-Coyote Agreement's terms or controlling law defining Coyote's obligations conflicts with the allegations of paragraph 6, such allegations are denied. Except to the extent admitted herein, the allegations in paragraph 6 are denied.

7.      In Answer to paragraph 7 of Plaintiffs' Complaint, Coyote admits the allegations contained therein.

8.      In Answer to paragraph 8 of Plaintiffs' Complaint, Coyote admits the allegations contained therein.

9.      In Answer to paragraph 9 of Plaintiffs' Complaint, Coyote lacks sufficient information to admit or deny the allegations therein and therefore denies them.

10.     In Answer to paragraph 10 of Plaintiffs' Complaint, Coyote lacks sufficient information to admit or deny the allegations therein and therefore denies them.

11.     In Answer to paragraph 11 of Plaintiffs' Complaint, Coyote lacks sufficient information to admit or deny the allegations therein and therefore denies them.

12.     In Answer to paragraph 12 of Plaintiffs' Complaint, Coyote admits that Amazon filed a notice of claim with Coyote, but states that Amazon has been paid in full for such claim by its insurance carrier, less $1,271,920.84 remitted by Amazon to Falvey Cargo Underwriting, LTD, representing what the parties agreed to be the value of recovered product. In Answer to the remaining allegations contained therein, Coyote lacks sufficient information to admit or deny them and therefore denies them.



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

13.     In Answer to paragraph 13 of Plaintiffs' Complaint, Coyote reasserts and incorporates by reference its answers to the above paragraphs as if fully set forth herein.

14.     In Answer to paragraph 14 of Plaintiffs' Complaint, Coyote denies the allegations contained therein.

15.     In Answer to paragraph 15 of Plaintiffs' Complaint, Coyote admits the allegations contained therein.

16.     In Answer to paragraph 16 of Plaintiffs' Complaint, Coyote lacks sufficient information to admit or deny them and therefore denies them.

17.     In Answer to paragraph 17 of Plaintiffs' Complaint, Coyote denies all allegations contained therein.

18.     In Answer to paragraph 18 of Plaintiffs' Complaint, Coyote denies all allegations contained therein.

## AFFIRMATIVE DEFENSES

By way of further answer to Plaintiffs' Complaint and as its affirmative defenses thereto, Coyote alleges as follows:

19.     **Failure to State a Claim.**  Complaint fails to state a claim against Coyote upon which relief can be granted.

20.     **Standing.**  Plaintiffs, as named, lack standing to initiate this action in that the Plaintiffs have been paid in full on their claim in this proceeding by Falvey Cargo Underwriting, LTD for and on behalf of Plaintiffs' insurance carrier and have assigned and transferred, through execution on February 24, 2010 of a subrogation receipt, all rights and remedies in respect to the subject matter of this claim to Falvey.

21.     **Non-Party Fault.**  Any damages or losses allegedly sustained by either or both Plaintiffs, which are denied, were caused only and solely by acts or omissions of entities or

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 4

654536.02



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

persons other than Coyote, which acts or omissions constitute an intervening and superseding cause of Plaintiffs' alleged damages and/or losses over which Coyote had no control.

22.  **Novation.**  Plaintiffs' claims are barred by the doctrine of novation.

23.  **Assignment.**  Plaintiffs at no time filed a claim against Coyote for any loss or damage other than that specifically assigned and transferred to Falvey.

24.  **Equitable Estoppel.**  Plaintiffs' claims are barred wholly or partly by the doctrine of equitable estoppel and/or promissory estoppel.

25.  **Mutual Mistake.**  Plaintiffs' claims are barred wholly or partly by the doctrine of mutual mistake.

26.  **Preemption.**  All state-law claims alleged explicitly or implicitly in Plaintiffs' complaint, including but not limited to Plaintiffs' common-law negligence claim, are pre-empted by 49 U.S.C. § 14706.

27.  **Reservation.**  Coyote reserves the right to add additional affirmative defenses, cross-claims, and counterclaims as information becomes available through investigation and discovery.

<div align="center">

**THIRD-PARTY COMPLAINT
AGAINST CP TRANSPORT, INC.**

</div>

COMES NOW Third-Party Plaintiff Coyote, and for its Third-Party Complaint Against CP Transport, Inc. ("**CP Transport**" or "**Third-Party Defendant**"), complains and alleges as follows:

<div align="center">

**JURISDICTION AND VENUE**

</div>

1.  Coyote is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

2.  Third-Party Defendant CP Transport is a corporation organized under the laws of the state of Florida, with its principal place of business in Doral, Florida.

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 5

654536.02

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

3.    CP Transport is authorized to transact business in the State of Washington and maintains an agent for Service of Process: Denise Alto, 3601 W. Washington Ave., Suite 1, Yakima, Washington, 98903; CP Transport may be served with a copy of this Third-Party Complaint at this location.

4.    Jurisdiction is proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 49 U.S.C. § 14706, as well as 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

5.    Venue is proper pursuant to 28 U.S.C. § 1391(a) and (c).

## FACTS

6.    On or about May 13, 2011, Amazon and AFS filed suit against Coyote in King County Superior Court under Cause No. 11-2-17491-3 SEA (the "**Amazon Lawsuit**"). Coyote was served with a copy of the Amazon Lawsuit Summons and Complaint on May 17, 2011, copies of which are attached hereto as **Exhibit 1.**

7.    On or about June 17, 2011, Coyote filed its Notice of Removal to the United States District Court for the Western District of Washington at Seattle. Plaintiffs Amazon & AFS were notified. A copy of Coyote's Notice of Removal filed with this court is attached hereto as **Exhibit 2.** Coyote also filed a Notice of Removal in the King County Superior Court and served that Notice upon the Plaintiffs; that Notice is attached hereto as **Exhibit 3.**

8.    Coyote has filed herewith its Answer and Affirmative Defenses to Plaintiffs' Complaint ("**Answer**").

9.    The Amazon Lawsuit makes claims against Coyote in the amount of $1,454,346.00 for alleged loss or damage to an interstate shipment (the "**Shipment**") arranged by Coyote in its capacity as a licensed motor-carrier broker.

10.    On or about November 27, 2009, in its capacity as a licensed motor-carrier broker, Coyote tendered the Shipment to CP Transport in good condition.

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 6

654536.02



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

83

11.     On information and belief, Coyote alleges that on or about November 28, 2009, the Shipment was stolen.

12.     At the time of the theft, the Shipment was in the possession, dominion and control of CP Transport.

13.     CP Transport transported the Shipment pursuant to a written Broker-Carrier Agreement between Coyote and CP Transport that was dated and entered into on April 10, 2009, (hereafter the "**Coyote-CP Transport Agreement**").   A true and exact copy of the Coyote-CP Transport Agreement is attached hereto as **Exhibit 4** and its terms are incorporated in full as if set forth herein.

14.     Pursuant to the Coyote-CP Transport Agreement, CP Transport assumed liability for loss or damage to the Shipment as a common carrier pursuant to the Carmack Amendment, 49 U.S.C. § 14706 (Coyote-CP Transport Agreement, at ¶ (3)(c)(ii)).   CP Transport also assumed liability for the full amount of any loss regardless of the level of insurance coverage (Coyote-CP Transport Agreement, Paragraph 3 (c) (VI)).   CP Transport further agreed to indemnify Coyote and/or its agent against claims such as that advanced by Plaintiffs Amazon and AFS (Coyote-CP Transport Agreement, Paragraph 4(M)).

15.     On or about December 7, 2009, Coyote filed a claim of loss against CP Transport in the amount of $2,522,983.68 (Claim No. 324733), which represented the full amount of the loss as claimed by Plaintiffs Amazon and AFS without consideration of any subsequently recovered product.

16.     CP Transport acknowledged Coyote's claim on January 29, 2010, but at no time has CP Transport declined or paid Coyote's claim.

17.     The Coyote-CP Transport Agreement provides as follows:

"Failure of carrier [CP Transport] to pay, decline or offer settlement within this 120-day period shall be deemed admission by the carrier of full liability for the amount claimed and a material breach of this agreement"

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 7

654536.02



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

(Coyote-CP Transport Agreement, Paragraph 3(c)(V)).

<div align="center">

**FIRST CLAIM FOR RELIEF:**
**BREACH OF CONTRACT**

</div>

18.     Coyote hereby restates and incorporates by reference all previous allegations and statements contained in this Third-Party Complaint Against CP Transport.

19.     CP Transport agreed to transport the Shipment for Coyote pursuant to the terms of the Coyote-CP Transport Agreement.

20.     The Shipment was loaded onto CP Transport's equipment in good condition and the Shipment was stolen while in transit.

21.     Coyote has made proper demand upon CP Transport for the value of the stolen Shipment.

22.     Pursuant to the terms of the Coyote-CP Transport Agreement, CP Transport is liable to Coyote for the full value of the stolen Shipment.

23.     CP Transport has failed and refused to make payment to Coyote, or to indemnify Coyote for the stolen Shipment, and therefore is in breach of the Coyote-CP Transport Agreement.

24.     As a proximate result of CP Transport's breach of the Coyote-CP Transport Agreement, Coyote has sustained or will sustain damages, and CP Transport is liable to Coyote for the full amount of the damages that Coyote has sustained or will sustain as a proximate result of CP Transport's breach, which amount is not less than the amount of any Judgment that Plaintiffs Amazon and AFS may obtain against Coyote in this case; or alternately, an amount not less than the amount that Coyote may be required to pay to the Plaintiffs or their assignees in order to settle or otherwise resolve the Plaintiffs' claims against Coyote in this case; plus prejudgment interest and post-judgment interest as allowed by law.


Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

85

**SECOND CLAIM FOR RELIEF:**
**CLAIM PURSUANT TO CARMACK AMENDMENT**

25.    Coyote hereby restates and incorporates by reference all previous allegations and statements contained in this Third-Party Complaint Against CP Transport.

26.    As a motor carrier, CP Transport is liable to a shipper pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, for loss or damage to a shipment incurred when the shipment is tendered to CP Transport in good condition and is damaged or lost prior to delivery to the consignee.

27.    The Shipment was loaded onto CP Transport's equipment in good condition and the Shipment was stolen while in transit.

28.    Coyote has sustained damages by reason of the theft of the Shipment.

29.    Coyote has made proper demand upon CP Transport for its damages sustained by reason of the theft of the Shipment.

30.    Pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, CP Transport is liable to Coyote for the full amount of the damages that Coyote has sustained or will sustain as a proximate result of the theft of the Shipment, which amount is not less than the amount of any Judgment that Plaintiffs Amazon and AFS may obtain against Coyote in this case; or alternately, an amount not less than the amount that Coyote may be required to pay to the Plaintiffs or their assignees in order to settle or otherwise resolve the Plaintiffs' claims against Coyote in this case; plus prejudgment interest and post-judgment interest as allowed by law.

**THIRD CLAIM FOR RELIEF:**
**CLAIM FOR EQUITABLE INDEMNIFICATION**

31.    Coyote hereby restates and incorporates by reference all previous allegations and statements contained in its Third-Party Complaint Against CP Transport.

32.    The acts and omissions of CP Transport, alleged above, proximately caused the losses alleged by Plaintiffs Amazon.com, Inc. and Amazon Fulfillment Services, Inc.



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

86

33.   As a direct result of the acts and omissions of CP Transport, alleged above, Coyote has been sued by Plaintiffs Amazon.com, Inc. and Amazon Fulfillment Services, Inc.

34.   No act or omission by Coyote has caused any damage or loss to the Plaintiffs, and Coyote is not otherwise connected with the wrongful acts and omissions of CP Transport.

35.   Coyote would not be involved in this lawsuit but for the wrongful acts and omissions of CP Transport.

36.   Under the doctrine of equitable indemnity, Coyote therefore is entitled to recover from CP Transport the reasonable attorneys' fees and costs that Coyote has incurred and will continue to incur in this matter, both at trial and on any appeal.

## PRAYER FOR RELIEF

WHEREFORE, Coyote Logistics, LLC, prays for Judgment in its favor as follows:

1.   Judgment against Plaintiffs Amazon.com, Inc. and Amazon Fulfillment Services, Inc., dismissing the Plaintiffs' Complaint against Coyote, with prejudice and with costs;

2.   Judgment against Third-Party Defendant CP Transport, Inc., on Coyote's Third-Party Complaint for the full amount of the damages that Coyote has sustained or will sustain as a proximate result of CP Transport's breach of the Coyote-CP Transport Agreement, which amount is not less than the amount of any Judgment that Plaintiffs Amazon and AFS may obtain against Coyote in this case; or alternately, an amount not less than the amount that Coyote may be required to pay to the Plaintiffs or their assignees in order to settle or otherwise resolve the Plaintiffs' claims against Coyote in this case; plus prejudgment interest and post-judgment interest as allowed by law;

3.   Judgment against Third-Party Defendant CP Transport, Inc., pursuant to 49 U.S.C. § 14706, for the full amount of the damages that Coyote has sustained or will sustain as a proximate result of the theft of the Shipment, which amount is not less than the amount of

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 10

654536.02



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

any Judgment that Plaintiffs Amazon and AFS may obtain against Coyote in this case; or alternately, an amount not less than the amount that Coyote may be required to pay to the Plaintiffs or their assignees in order to settle or otherwise resolve the Plaintiffs' claims against Coyote in this case; plus prejudgment interest and post-judgment interest as allowed by law;

    4.    Judgment against Third-Party Defendant CP Transport, Inc., in the amount of Coyote's reasonable attorneys' fees and costs incurred herein pursuant to the doctrine of equitable indemnification;

    5.    Judgment against Third-Party Defendant CP Transport, Inc., in the amount of Coyote's reasonable attorneys' fees and costs incurred herein pursuant to all applicable statutes, including but not limited to RCW 4.84.185;

    6.    Judgment allowing Coyote to amend its pleadings to conform to the evidence presented at trial; and

    7.    Judgment awarding to Coyote such other and further relief as this Court may deem just and proper.

    DATED this 1st day of July, 2011.

RYAN, SWANSON & CLEVELAND, PLLC

By _____
John R. Ruhl, WSBA #8558
Amanda C. Bley, WSBA #42450
Attorneys for Coyote Logistics, LLC
Defendant and Third-Party Plaintiff

1201 Third Avenue, Suite 3400
Seattle, Washington 98101-3034
Telephone: (206) 464-4224
Facsimile: (206) 583-0359
Email:   ruhl@ryanlaw.com
         bley@ryanlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE MITCHELL LAW FIRM


By _Bruce E. Mitchell (by JRR)_
Bruce E. Mitchell, Georgia Bar #512350
Attorneys for Coyote Logistics, LLC
Defendant and Third-Party Plaintiff

3390 Peachtree Road, Suite 520
Atlanta, GA  30326
Telephone: (404) 262-9488
Email:   bmitchell@bemlaw.com

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 12

654536.02

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

1

## 1. CERTIFICATE OF SERVICE

2      I hereby certify that on this day I electronically filed the foregoing document with

3   the Clerk of the Court using the CM/ECF system which will send notification of

4   such filing to the following:

5

6   Christopher W. Nicoll
    Larry E. Altenbrun
7   NICOLL BLACK & FEIG
    1325 Fourth Avenue, Suite 1650
8   Seattle, WA 98101

9   DATED this 1st day of July 2011.

10

11                              s/John R. Ruhl
                                Ruhl, WSBA #8558
12                              Attorneys for Defendant
                                1201 Third Avenue, Suite 3400
13                              Seattle, Washington 98101-3034
                                Telephone: (206) 464-4224
14                              Facsimile: (206) 583-0359
                                E-mail: ruhl@ryanlaw.com
15

16

17

18

19

20

21

22

23

24

25

26

COYOTE LOGISTICS, LLC'S ANSWER
AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT,
AND THIRD-PARTY COMPLAINT - 13

654536.02

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

# Exhibit 4

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMAZON.COM, INC., and AMAZON
FULFILLMENT SERVICES, INC., Delaware
corporations,

                    Plaintiffs,

    v.

COYOTE LOGISTICS, LLC, a Delaware limited
liability company,

                  Defendant and
             Third-Party Plaintiff,

    v.

CP TRANSPORT, INC., a Florida corporation,

             Third-Party Defendant.

No. 2:11-cv-01015 RSL

**FIRST AMENDED COMPLAINT**

Plaintiffs, Amazon.com, Inc. ("Amazon") and Amazon Fulfillment Services, Inc. ("AFSI"), sometimes referred to collectively herein as "Amazon," for their First Amended Complaint against the above-named defendant, allege upon information and belief:

**JURISDICTION AND VENUE**

1.    Jurisdiction and venue in this matter are conferred by RCW 2.08.010 and RCW 4.12.025(3), and venue is further conferred by section 10.2 of the "Transportation Agreement" entered

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 1

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515

92

1    into by the parties or their predecessors on or about August 13, 2007, and later amended in writing by

2    the parties on or about August 31, 2009 (hereafter "Agreement"), a copy of which is attached hereto as

3    Exhibit "A" and incorporated herein as if fully set forth.

<div align="center">

### PARTIES

</div>

4

5    2.    At all times hereinafter mentioned, Amazon and AFSI were and are Delaware

6    corporations authorized to do business, and doing business, in the State of Washington, and having

7    their principal place of business in Seattle, Washington. Amazon and AFSI are affiliates of each other

8    and are parties to the Agreement with defendant.

9    3.    At all times hereinafter mentioned, defendant COYOTE LOGISTICS, LLC ("Coyote")

10   was and is a Delaware limited liability company with offices in Mountlake Terrace, Washington.

11   Coyote is the successor in interest to General Freight Services, Inc. ("General"), a Georgia

12   corporation. Coyote does business within the State of Washington, has agreed pursuant to section 10.2

13   of the Agreement to subject itself to the jurisdiction of the courts of King County, Washington, and

14   this lawsuit arises out of business that Coyote has conducted with Amazon in the State of Washington

15   pursuant to the Agreement.

<div align="center">

### FACTS

</div>

16

17   4.    On or about August 13, 2007 AFSI and General entered into the Agreement. On or

18   about August 31, 2009 AFSI and Coyote entered into a written amendment of the Agreement that,

19   among other things, identified Coyote as the successor in interest to General, and formalized

20   Amazon's and AFSI's consent to transfer of the Agreement by operation of law from General to

21   Coyote.

22   5.    Pursuant to the Agreement, Coyote agreed to transport by truck Amazon's goods to

23   certain specified locations within the United States, as well as to perform other enumerated related

24   services, at prices set forth in the Agreement and its amendment.

25   6.    Section 7 of the Agreement specifically addressed Coyote's liability to Amazon in the

26   event of damage, loss or theft of Amazon's goods. Paragraph 7 provides:

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 2

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL:  206-838-7555
FAX:  206-838-7515

93

Company [Coyote] will in no event be liable for any loss, theft or damage to goods for any amount in excess of two hundred fifty thousand dollars ($250,000) per container *except to the extent such loss or damage is attributable to the negligence or misconduct of Company or any of its employees, representatives, agents, affiliates or subcontractors (including Carriers).* Amazon has the option of paying a special compensation to increase the liability of Company [Coyote] in excess of the amount per shipment specified in above [sic] in case of any loss, theft or damage from causes which would make Company [Coyote] liable, but such option can be exercised only by specific written agreement made with Company [Coyote] prior to shipment, which agreement will indicate the limit of the Company's [Coyote's] liability and the special compensation for the added liability by it to be assumed.  [Emphasis added]

7.   Section 4 of the Agreement provides in part that Coyote "will use reasonable care and due diligence in the protection of the goods or shipments...."

8.   Section 9.2 of the Agreement, as amended, provides in part that Coyote may subcontract with Carriers to provide services under the Agreement, but that Coyote "will be responsible for all acts, omissions, negligence and misconduct of such Subcontractors...."

9.   On or about November 24, 2009 in Sumner, Washington, Coyote's subcontracted carrier, CP Transport Inc., took possession of a 53 foot long container loaded with a cargo of Amazon's goods and signed bill of lading number 11242009-3, confirming receipt of the goods in good order.

10.   After receiving and signing for the cargo, the truck driver departed Sumner, Washington driving a 1996 Freightliner tractor with Florida license plate 76966F, identified as truck number 443, and hauling the 53 foot container on a trailer bearing Florida license plate 5581CE, identified as trailer number 6016.

11.   On or about November 28, 2009 at or about shortly after midnight, the truck and trailer were parked at a truck stop in Troy, Illinois and left by the driver unlocked, running and unattended for approximately one and a half hours. When the driver returned to where he had left the truck, trailer and cargo, it was gone and he reported it stolen to the Troy Police Department.

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 3

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL:  206-838-7555
FAX:  206-838-7515

94

12.     After the loss was reported, Amazon and its insurers incurred reasonable investigation expenses in an effort to mitigate their losses by locating and recovering the stolen goods. With the help of private investigators and law enforcement agencies in South Florida, a quantity of the stolen goods was recovered, some of which were damaged and required refurbishment.

13.     After deducting the fair market value of the recovered undamaged goods, and the fair market value of the recovered damaged goods that were refurbished, Amazon's cargo loss was mitigated to ONE MILLION FOUR HUNDRED FIFTY FOUR THOUSAND THREE HUNDRED FORTY SIX DOLLARS ($1,454,346.00), which represents the fair market value of the missing goods plus the lost market value of the damaged goods (eight units in all) that were refurbished. Additionally, Amazon and its insurers incurred reasonable costs of investigating, recovering and shipping the recovered goods. The remaining stolen goods were not located and are still missing.

14.     On or about January 28, 2010, Amazon timely provided written notice of claim to Coyote pursuant to 49 U.S.C. § 14706(e) and 49 C.F.R. § 370.3, but Coyote has since failed and refused to pay the claim.  The amount sought in this lawsuit is less than the amount initially claimed by Amazon because, as alleged in paragraphs 10 and 11 above, a portion of the stolen cargo was located and recovered subsequent to providing written notice of claim to Coyote.

### FIRST CAUSE OF ACTION:

### [CLAIM FOR LOSS 49 U.S.C. § 14706]

15.     Amazon re-states, re-alleges and incorporates by references as though fully set forth herein, paragraphs 1 – 12 of the Complaint.

16.     Coyote agreed pursuant to the Agreement to transport the goods for Amazon.

17.     Amazon delivered the cargo to Coyote or its employees, representatives, agents, affiliates or subcontractors, including carriers, in good condition.

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 4

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515

18. Coyote or its employees representatives, agents, affiliates or subcontractors, including carriers, confirmed receipt of the cargo in good condition by signing bill of lading number 11242009-3.

19. As a result of the negligence and/or misconduct of Coyote or its employees, representatives, agents, affiliates or subcontractors, including carriers, Amazon's cargo was stolen and Amazon suffered damages in the amount of ONE MILLION FOUR HUNDRED FIFTY FOUR THOUSAND THREE HUNDRED FORTY SIX DOLLARS ($1,454,346.00), plus reasonable costs of investigating, recovering, repairing and shipping the recovered goods, plus freight for the original carriage, in a total amount to be determined at trial.

20. Under 49 U.S.C. § 14706(a)(1) and the Agreement, Coyote is liable to Amazon for the full, actual loss or injury to Amazon due to the theft of its goods as measured by their fair market value at destination because their loss is attributable to the negligence and/or misconduct of Coyote or its employees, representatives, agents, affiliates or subcontractors, including Carriers.

**SECOND CAUSE OF ACTION**

**[BREACH OF CONTRACT]**

21. In the alternative to its cause of action against Coyote under 49 U.S.C. § 14706(a)(1), Amazon makes the following cause of action for breach of the Agreement under Washington state law.

22. Amazon re-states, re-alleges and incorporates by references as though fully set forth herein, paragraphs 1 – 18 of the Complaint.

23. Pursuant to the Agreement, Coyote agreed to arrange for transport of the goods for Amazon, and to be responsible to Amazon in the event of loss of the goods.

24. Amazon delivered the cargo in good condition to Coyote or its employees, representatives, agents, affiliates or subcontractors, including carriers hired by Coyote.

25. Coyote or its employees representatives, agents, affiliates or subcontractors, including carriers hired by Coyote, confirmed receipt of the cargo in good condition by signing bill of lading number 11242009-3.

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 5

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515

96

26.     As a result of the negligence and/or misconduct of Coyote or its employees, representatives, agents, affiliates or subcontractors, including carriers, Amazon's cargo was stolen and Amazon suffered damages in the amount of ONE MILLION FOUR HUNDRED FIFTY FOUR THOUSAND THREE HUNDRED FORTY SIX DOLLARS ($1,454,346.00), plus reasonable costs of investigating, recovering, repairing and shipping the recovered goods, plus freight for the original carriage, in a total amount to be determined at trial.

27.     Under the Agreement, Coyote is liable to Amazon for the full, actual loss or injury to Amazon due to the theft of its goods as measured by their fair market value at destination because their loss is attributable to the negligence and/or misconduct of Coyote or its employees, representatives, agents, affiliates or subcontractors, including Carriers.

28.     Coyote has failed and refused to pay what it owes to Amazon and has thereby breached sections 7 and 9 of the Agreement, damaging Amazon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against defendant as follows:

1.     For damages in an amount to be determined at the time of trial;

2.     For prejudgment and post-judgment interest in an amount allowed by law;

3.     For attorneys' fees, costs and expenses of suit as allowable by law; and,

4.     For such other relief as the Court may deem just and proper.

DATED this 21st day of November, 2011.

NICOLL BLACK & FEIG PLLC

/s/ Christopher W. Nicoll
Christopher W. Nicoll, WSBA No. 20771
Larry E. Altenbrun, WSBA No. 31475
Counsel for Plaintiffs

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 6

LAW OFFICES OF
NICOLL BLACK & FEIG
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**John Raymond Ruhl**
RYAN SWANSON & CLEVELAND
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
Telephone: 206-654-2217
Fax: 206-652-2917
Email: ruhl@ryanlaw.com

**Amanda Clare Bley**
RYAN SWANSON & CLEVELAND
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206-654-2249
Email: bley@ryanlaw.com

**Bruce Mitchell**, *Pro Hac Vice*, **Georgia Bar No. 512350**
THE MITCHELL LAW FIRM
3390 Peachtree Road, Suite 520
Atlanta, GA 30326
Telephone: (404) 262-9488
Facsimile: (404) 231-3774
Email: bmitchell@bemlaw.com


/s/ Christopher W. Nicoll
Larry E. Altenbrun, WSBA No. 20771
Counsel for Plaintiffs

FIRST AMENDED COMPLAINT
(No. 2:11-cv-01015 RSL) - 7

LAW OFFICES OF
NICOLL BLACK & FEIG
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515